This case is WALL v. COUNTY OF ORANGE. Good afternoon, Your Honors. I would like to reserve 5 minutes of my presentation for rebuttal, if I may. Please watch your own time.  Thank you, Your Honor. This is yet another summary judgment motion on a 1983 case which the district court, Judge Stopler, granted in favor of the defendant, notwithstanding the substantial volume of evidence submitted in opposition to the summary judgment motion with respect to both the issues of excessive force and an unlawful arrest. The volumes of the transcripts of the record are very thick. They cover many hundreds of pages, in hopes that the court would, that it would be easier for the court to see that there was substantial evidence submitted on the question of whether or not the force used in this arrest was excessive or not. In my opening brief, I tried to draw a table for the court to use to track the submission that was before the district court, Judge Stopler. In essence, Your Honor, I think this case is, it's really a two-question case. One, is there enough evidence to get to the jury on the issue of whether or not the arrest was unlawful, which is, of course, a Fourth Amendment seizure issue? And is there enough evidence to get to the jury as to whether the force utilized in the effectuation of the arrest was excessive? Again, there are huge disputes between plaintiff and defendant as to what happened. But what's most interesting is that in the deposition of the officer himself, he acknowledged that at the time of the arrest, the defendant didn't do anything. He didn't attempt to flee. According to the officer, his sole, the defendant's, the suspect, Dr. Wall's sole act is to do with the arrest. I want to ask a question about history. Am I correct that these citations are not to the excerpts of record? I'm trying to follow them, and they're not matching up. The excerpts of the record, no, Your Honor, they are. What happened, we used the, for example, if Your Honor could direct me to which page and I'll explain it to the court. Well, I don't know if it's worth the time. It's cited to CR. CR is clerk's record, no? Yes, Your Honor. The clerk's record and the page of the clerk's record. So it's not cited to pages in the excerpts of record, just in terms of trying to use this? Well, it is. For example, where I reference on page, just as an example, page 14, I reference the deposition of Officer Wall, Deputy Wall, and it's at page, clerk's record, item 167, but it's page 394, lines 5 through 11, or page 287, lines 11 through 19, or page 288 through 289, lines 1 through 7. All right.   In any event, all of this was placed before Judge Stopler in the form of our opposition to the motion for summary judgment in the form of our statement of disputed facts. And as to each of those elements of the disputed facts, we attached exhibits supporting each of the elements of evidence. This Court recently, in Martinez v. Stanford, reversed the summary judgment motion granted on an excessive force issue. And in the Martinez case, the Court set the rule that should have been followed in our case, but wasn't followed. In a saucier evaluation, the two issues are, was there a constitutional right that was clearly established? And whether that right was clearly established, when viewed in the context of the case, has to be viewed in the light most favorable to the plaintiff. And in my case, just as in the Martinez case, the same thing happened to Dr. Wall. The best thing you could do is to be very specific. I mean, we know all this. Certainly. The facts of this case are very simple. Dr. Wall went to a car wash. He wanted a car wash. They offered him a special. It was a car wash together with an oil change. He submitted his brand-new Lexus truck to the car wash. They asked for his address. He refused to give his address. They said they insisted on his address. Of course, by now, they've already got possession of his Lexus. He says, I don't give out my address. An issue ensued, and he insisted on getting his car back and leaving the location. In fact, they agreed at the location that they would give him back his car and he would leave. In the interim, the police were called. Deputy Culver is the first person to arrive at the scene, and she testified under oath that when she got there, Dr. Wall was outside of the location waiting. That's all he was doing. She approached him. She talked to him. At that time, Deputy Watson arrived. Deputy Watson spoke briefly with Dr. Wall, and then he went inside the location and spoke with Mr. George Chawla Sr. Mr. Chawla Sr. is important because it was only Sr. who was at the location at the time that Deputy Watson arrived, but he wasn't there at the time of the alleged trespass that instigated the crime. I didn't understand that from the record, although I don't think it's that important to your argument. I thought he did talk to Jr. at one point. He didn't talk to Jr. on a regular basis. That's not my understanding of the record, but I don't see why it matters. Because Deputy Watson had no probable cause to effectuate any arrest on Dr. Wall. Well, as I understand it, he was asked to remove himself from the premises, or he would be arrested. Yes, sir. And he did. Isn't that sufficient cause? Isn't that probable cause, let alone in violation of an ordinance? No, Your Honor. It's not. No, Your Honor. In order for a police officer to effectuate a misdemeanor arrest, the act which constitutes the crime must occur in his presence. I agree with that. The only act that occurred in my client's presence, in the presence of Officer Deputy Watson, and the only act that occurred, was while walking to the location where they told him his car could be picked up. According to the testimony of Dr. Wall, he turned his head to speak to the deputy who was behind him. According to the deputy, Dr. Wall turned completely around to speak to the deputy. But all of the evidence, including the testimony of Deputy Watson, including the testimony of Deputy Culvert, was that my client's hands were at his side. He wasn't threatening. He made no gestures. He simply turned to speak to the officer, whereupon the officer grabbed my client by the wrist, spun him around, threw him upon a car. He twisted the wrist and caused a nerve injury that caused my client to lose his dental practice. The issue before the Court is twofold. Whether or not what occurred to Dr. Wall was, in fact, excessive force. And But that's a different argument. Let's get back to the arrest. You're truly emphasizing the arrest. If there is no There was nothing there done in the presence of the officer. What about the obscene language? Didn't that occur in the presence of the officer? There was no obscene language, Your Honor. In fact, Mr. Chawla As I understand, Dr. Wall says there wasn't any, but the officer says there was. Well, Dr. Wall said there wasn't any. Deputy Culvert said there wasn't any. Mr. Chawla himself said he didn't hear any profanity. I don't think Watson says there was either, does he? I'm sorry? Does Deputy Watson say there was obscene language? He doesn't say there was obscene language. Nobody says it. Now, there were some people who said it earlier, who said there were some witnesses who said later that earlier there had been obscene language. Mr. Romano, yes, Your Honor. Mr. Romano, who was not interviewed prior to the arrest, but was interviewed by Deputy Watson subsequent to the arrest, thought there was profanity. But Deputy Watson would not have known that at the time of the arrest because he hadn't interviewed Romano prior to the arrest. And, in fact, Chawla, who Chawla, Jr., the guy who was there at the time, wasn't interviewed at all until after the arrest. And he said, no, there was no profanity. So there was certainly no To him there was no profanity. He didn't know whether there was profanity or something else. Yes, Your Honor. To him there was no profanity. But at the very least, there was no profanity in the presence of Deputy Watson. In fact, Deputy Watson didn't find out about any alleged profanity, as I say, until he interviewed Mr. Romano, which is well after the arrest. So What about the frailing of his arms? There was no. Here we have a dispute of the evidence. Deputy Culver said when Deputy Watson went to speak with Mr. Chawla, Dr. Wall remained with Deputy Culver. There was no flailing of the arms. When she said in her testimony, what did you see? Where was his arms? Where was his arms? Were they at his side? In fact, when I, in the deposition of Deputy Watson, when I asked him, how did you grab hold of his wrist? He said, I reached down and I grabbed his wrist. Where was he? Deputy Watson did claim that at one point when he went to speak to one of the Chawlas – I still think Junior was there, but maybe I'm wrong – that Wall was standing continuing to talk and be agitated and made it difficult for him to have the conversation. That's what Deputy Watson said in his declaration. However, Deputy Wall said that Dr. Wall stayed with Deputy – I'm sorry, Deputy Culver said Dr. Wall stayed with Deputy Culver while Deputy Watson went to speak to Chawla. So right there we at least have, again, in the light most favorable to the plaintiff, we certainly have testimony of a sworn officer as to where Deputy – where Dr. Wall was. But even that, Your Honor, it has to rise to the level of interfering with a business. Well, actually, the – you kept saying that, and this I think you're not saying it as strong as it is. The statute actually doesn't say interfering. It says obstructing or intimidating, which is stronger than interfering. That's true. However, and in fact, in support of that, everybody said my client didn't threaten anybody. He didn't – he didn't make any verbal threats. He didn't make any physical threats. That's throughout the transcript and, as I said, was provided to Judge Stotler in the opposition to Chawla. Is there any California law about what this means, obstructing or intimidating, do you know? You know, it's one of those, it depends on what the jury believes, if the conduct rises to the level of preventing the business from ongoing, from dissuading people. It doesn't mean physically obstructing, right? It doesn't mean – it doesn't necessarily mean physically obstruct. It would mean to interfere with the ongoing nature of the business. But again, there was no evidence whatsoever of that in the sense that, if you're not – I would like to draw the Court's attention. They had a meeting after Mr. – after Dr. Wall insisted on getting his Lexus back and that he would be happy to leave the premises, give me my car. When they found out that the car was already up on the jack, Dr. Wall went into the office, not outside where the patrons were. It didn't interfere with anything. And there was no evidence at all. Well, there is evidence in the record that he cursed at the cashier, the cashier was afraid, and that I think one of the – I don't know if it was two other employees or if one of them was a customer, all before he went to talk to Chawla in the office, as I understand. Yes, Your Honor. There is a dispute as to that evidence. But all of that occurred prior to the arrival of the officer. And one of the first questions that I asked the officer in the deposition was, was this a citizen's arrest or was this an arrest by an officer on a misdemeanor? And his testimony was this was an arrest by an officer on a misdemeanor. That act requires that the crime be committed in the presence of the officer. And what he testified to and what, both in his deposition and even in his later statement, was that he placed Dr. Wall under arrest because while walking to pick up his car, Dr. Wall stopped and turned. Dr. Wall. And as to that, there's definitely a conflict of evidence. And as to that, there's definitely a conflict of evidence. But the conflict is only that Dr. Wall says, I turned my head to talk to him. Never stopped. Dr. Wall says, I turned my head to talk to him. I never stopped. The deputy says, he turned and stopped. And the deputy took that to mean that he was refusing to leave. And even on the deputy's version, he didn't say, okay, I'm not going to go. He just. No, even in the deputy's version, he said, yes, I want to leave. I want to get my car and get out of here. Your Honor, the testimony was, he and his wife had tickets to an NC football game that afternoon. The last place they wanted to be was arguing over a car wash in Laguna Niguel. He wanted to go home. That's all he wanted to do. He wanted to get his car and go home. All right. If you want to stay five minutes, you have less than five minutes. Thank you. Good afternoon, Your Honors. May it please the Court. Bill Bernard on behalf of the County of Orange and Deputy Watson. I'd just like to begin as I sit here listening. I've never heard a more distorted representation of the record in my life. Well, just bear in mind, we assume all the facts in favor of the nonmoving party. I understand. So any fact you give us is a fact that they have put forward. Don't give us your version of the facts. Give us the undisputed facts as seen from the perspective of the plaintiff. Can you do that? I can do that, Your Honor. In fact, if I had the time, I'd love to sit here and read into the record the witness deposition testimony, which makes it very clear that, number one, there wasn't an unlawful arrest, and, number two, there wasn't any excessive force. Right. These are the ones, it seems to me, are conflicts in the record that may suggest that the summary judgment was improperly granted. I'd like some comments on them. First of all, as I understand it, the ---- Officer Watson says the reason he knew that this person wasn't leaving was because he stopped. Right? I'm sorry, Your Honor. Because he stopped as he was walking away. They agree that he was walking toward the car and he was going to leave. Right? And the precipitating factor in the arrest was that he stopped. Three times. Not once, not twice. Three times. Well, first of all, I have read the record, and I saw he said he stopped at the time just before he actually did the arrest. Okay? And Dr. Walsh says he didn't stop. Is that true? Dr. Walsh did not stop. He says he didn't stop. His testimony is he didn't stop. Yes? Yes. He stopped but turned around and confronted the officer three times, and the officer warned him each time to go to the car. All right. But Watson says at the last time that he stopped, and Dr. Walsh says he didn't. Is that much true? No, he didn't stop. Is there a difference in the evidence on that issue?  stop or not? No. Did Dr. Walsh testify that he stopped or that he didn't stop? He did stop, and he confronted the officer. Did Dr. Walsh testify that he did not stop? That he kept walking but turned around to talk to Dr. Walsh? All right. Isn't that a conflict in the evidence on the key question of whether or not he was refusing to leave at the point that he was arrested? No? Why is that a conflict? No. Why is that a conflict in the evidence? If the doctor turns around and confronts the officer after the officer tells him to keep going and go to his car and get out. He says he was Dr. Walsh. You agreed with me just now, and I believe it to be in the record, that Dr. Walsh's testimony was he was still walking and he turned over his shoulder to talk to Deputy Watson. Is that what Dr. Walsh said? I don't know what Dr. Walsh said specifically as I stand here before you, but I know what at the time that this came down and the time I briefed this, Dr. Walsh, my understanding of the evidence, based on the deposition testimony of Dr. Walsh, which I don't have in front of me, in the deposition testimony of Watson, is that he turned around and confronted the officer on three straight occasions. Now, that means he stopped. No, I think it did be testified he stopped. He did not. Let's take that as a, unless you can point to evidence to the contrary. Could Dr. Walsh and Deputy Watson disagree in the depositions about whether or not Dr. Walsh stopped at that point? Is there a disagreement in the record about that? No, I don't think there is. I don't think there is, no. And if you read the independent witness testimony, let's forget about Walsh. No, no, no, no. No, we can't. Because we've got to take the evidence most favorable to the nonmoving party. We take Dr. Walsh's testimony. Unless you can point to us where Dr. Walsh said, yes, I stopped, you've lost your case. No, I disagree. Well, what do you disagree with? Well, if you look at the statements of the independent witnesses. But that's not relevant. But it is. But I think it is relevant. Why is it relevant? That's a jury question. I think it is relevant. And unless I. Please tell me why is it relevant if the plaintiff testified to the contrary? Because Dr. Walsh never left as he was supposed to. No, no. You're defending summary judgment. The facts have to be undisputed. Don't you understand that? Dr. Walsh said that he would not leave until his car was washed. His car was not yet washed. He wasn't. He said that he wasn't going to leave. No, you shifted the thing. We first asked you, did he stop? As far as we know, and I've read the record, Judge Berzon has read the record, he did not testify he stopped. You haven't pointed to any point where he says he stopped. So now you've got a key fact, and you've got to assume that's true for this purpose of this appeal. I don't think you do, because the testimony of Dr. Walsh is, and I can point to it in the record, is that he said he was not going to leave until his car was washed. That's why you shifted the grounds. That's another point. But that's in his intent. He's expressing his intent not to leave. But Dr. — but Deputy Watson, as I understand it, said he arrested — and this he was very specific about. He was arrested because he refused to leave. How do you know he refused to leave? Because he stopped. Right? Is that what he said? And I infer that he was refusing to leave from that. He didn't say anything about the car wash. Apparently, they — as far as I could tell, they both understood that he was going to where the car was going to be washed. He was going to stand at the end. When they gave him back his car after the washing, he was going to leave. And Deputy Watson didn't seem to have a problem with that. His problem was that he stopped. Well, the problem was, Your Honor, the problem is that Dr. Wall on three occasions refused to go to his car. On the last occasion, he didn't go to his car. He confronted the officer. If you want to say he confronted him by turning his head and giving him, you know, speaking up and being nasty to him, then that's what he did. But the point is he never just shut up and went to his car. He was trespassing. He was asked to leave and he didn't do it. I think the officer could have arrested him on the first occasion. Why does it — you know, he refused to do that. Sotomayor, calm down. Mr. Watkins, please don't push it. If you want it, we're trying to follow what the testimony is of the plaintiff. We have to accept it as true. The testimony is he did not stop. Will you please accept it? Your Honor, the scintilla of evidence doesn't — doesn't warrant the dismissal of the summary judgment. You have to look at the independent witnesses. You have to look at the totality of the evidence. And I think the Court's not looking at that. Sotomayor, my goodness, where did you go to law school? Well, I won't pursue that, but. Well, you know, if this Court is prepared to rule that because — that whether he looked over his shoulder and again started talking to the officer or turned around and faced him, and that's a distinguishing factor, then, you know, there's nothing I'm — I'm sorry. The question, it seems to me, is why did Dr. Watson's — from what did Dr. Watson's testimony say? Why did Dr. Watson's testimony say that he was refusing to leave? What did Dr. Watson say about that? I mean, Deputy Watson, I'm sorry. Deputy Watson said, Your Honor, that on three occasions — and by the way, Deputy Watson, in his testimony, in his declaration, which I also think the Court's forgetting, is that he witnessed himself the obstruction of the court's — of the business operation, and he asked him to leave. And those are two independent bases, by the way, where you can perform an arrest under PC 602. Oh, excuse me. That is not true. The statute says and. I looked at this because the briefs quoted sometimes as a war and sometimes as and. But the statute says and. Well, I have it quoted here, and it says war. But nevertheless — Wrong, because that's not what it says. Nevertheless, Watson — Watson — and it's unrefuted. Watson saw what he saw as described to him exactly as it occurred before he got there. But there was one concern. I reminded you when you started eight minutes ago, you've got to accept the plaintiff's version. You can't supply your own version. The plaintiff's version depends on the other deputy and so forth and so forth. You can't keep citing what Watson said as though that were the truth. Your Honor, you don't — just because a plaintiff says — there's never been a summary judgment granted where a plaintiff hasn't at least come up and said, you know, this isn't the way it happened. You look at the — No, no. You look at the totality of the evidence. No, no, you really don't. You really don't. This guy never said he was going to his car to leave. He never did. And he was there three times. I understood him to say that over and over again. All he — all he wanted to do was get out of there and leave. I was on the way to the car to leave. And while I was on the way to the car and walking to get it, I turned around over my shoulder and talked to Deputy Watson. That was my understanding of his testimony. Is that an incorrect understanding? No. He — he turned around and he got nasty with Deputy Watson. And Deputy Watson's testimony that — that I'd love to read says what he did. Go ahead and read it. Go ahead and read it. I won't cite — for brevity's sake, I won't cite all of it. But I'm at the Supplemental Excerpts of Record at page 160. Okay. It's talking about Dr. Wald. I realized that he was being argumentative with me and that there wasn't any point to further discuss the situation. And at that point, did you give him a direct instruction or order to leave the location? Yes. And he agreed to comply with that order, didn't he? No, not initially. Did you tell him that if he didn't leave, you'd arrest him for trespass? Yes. And he even commenced walking in the direction that would lead him to his car. Excuse me. Did he then agree to leave? When I told him that he had to leave, he agreed to leave. That's what he said. Yeah, but not initially. I'm skipping some of this, Your Honor, to try to get to the point you're interested  in. He commenced walking in the direction which would lead him to his car. Is that correct? No, he didn't leave then. We had to. I had to figure out where his car was parked so he could pick up his car. Well, I went to talk to the owner of the business, George Chawla, and when you got to George Chawla, where was Dr. Wald? He was at my back interfering with a conversation between me and George Chawla Sr. He came up behind my back, wanted to talk to me. I kept telling him, I'll talk to you, but first I have to talk to Chawla. He didn't step away. I had to order him several times to step away. All right. As to that, is there not a contradiction in the evidence? I told him. That's what he said. But is it not true that the other deputy says that Dr. Wald was with her the whole time? No. He took no. You know, we went to great efforts, Your Honor, to point out in our brief, which is exactly what happened at the summary judgment and why Judge Stotler, you know, really, you know, I mean, she did some investigation here. They miscite the record. What Comer said was he was with me and then he runs over, Wald leaves her and runs over 40 feet to go behind Watson. Let me ask you. He never stayed with her. Let me change the subject for a little while. About the excessive force question, okay, with regard to the handcuffs. You said in your brief that there was no evidence that he ever asked them to loosen the handcuffs. That's correct. Again, reading the record, it seemed to me that on page 221, I think of the supplemental excerpts, in his deposition he said that he asked him to take off the handcuffs or to loosen the handcuffs. Is that not right? Your Honor, let me make a point about this. If this Court's prepared to hold, and I don't think it is, that the mere request to loosen handcuffs without more. I'm asking a different question. You said in your brief that he never said it. I got it right here. On my supplemental excerpts of record 483, I asked him to loosen the handcuffs. I don't remember if it was to loosen or to take off. Then he goes on to say, I don't even remember if I asked when the car was stopped or if the car was moving. And he never makes clear to the deputy that he has some sort of a problem. If you look at the Ninth Circuit cases that have ruled that handcuffs are excessive force, there's one that says somebody's leg was in their back. There's another one that says they have bruises on the upper arm. And there's another one that has a prior injury that they made known to the officer prior to the handcuffing. None of that occurred here. He doesn't even – he can't even – All right. Just once again. He said – here we are again. I'm sorry to be arguing, but there's really a problem with not representing – we're not going to get any place with this discussion if we don't have the record stated the way it's in the record. Okay? I understand, Your Honor. The record as it's in the record here says that I was in pain. I asked him to loosen the handcuffs. I was in pain to take off the handcuffs. I don't remember if it was to loosen or take them off, but I was in pain and I was  injured. In other words, he's not – or could a jury not infer that while he doesn't know whether he said to loosen them or to take them off, he said I was in pain? Could a jury? When a man – when a man doesn't even – there's nothing in this record that makes clear at all that he ever communicated that he was in pain to the deputy. He says, please take my handcuffs off, which a million defendants probably say during the course of a day, but he never says, you know what, deputy, I'm in pain, I'm a dentist, my arms are numb. My hands are numb. And even then, if the vehicle's moving, I doubt that it would have been proper or reasonable for the – for the officer to do it. I think as the Third Circuit said, there's a clear problem between the circuits on whether handcuffing exacts excessive force, and that means that it's not clearly established, i.e., qualified immunity applies. So you think that if a jury inferred from this – A, could a jury infer from what I just read you infer that he did at least communicate that he was in pain? No? No. I don't – I don't – he – all he says was I was in pain. He doesn't say he's communicating that to anybody at all. Now, once you're parsing it very closely, I'd like to ask you about the violence with which the arrest was affected. What violence does that mean? You know, may I remind you, Mr. Watkins, you're here to argue a case, not to examine the court. What violence was that? He spun him around, twisted his arm. Why didn't he say, I'm putting you under arrest? Your Honor, he warned him three times. No. Why didn't he say, I now put you under arrest? I don't know of any law that requires that, Your Honor. If you read the witness statements, this man struggled. Independent witnesses say this man struggled. After he attacked him. As I read the record, the doctor was assaulted by the deputy. Violently. His glasses were broken. It was an outrage. If you believe the testimony in this case, an outrageous assault was made on this doctor as he walked to his car. I think that's ludicrous, Your Honor. And I'm asking – well. I think that's not a reading of the record the way I see it. I don't think – You could say that. To say it's ludicrous is a little bit presumptuous. But you've taken an amazingly antagonistic attitude for somebody trying to – Because I know the record of this man and I know what he's doing. You know it very well. But you tell me, take my reading of the facts. The doctor is assaulted by the deputy who could have simply said, I put you under arrest. What justified that assault? Because he wouldn't leave after three times because he was disturbing the premises, because he was disturbing the customers, because people felt threatened. Please answer the question. Did he have any reason to believe that this man was in any way dangerous? Since when does a trespass require somebody to be dangerous? No, no. That's not the question with regard to the trespass. It's a question with regard to the manner in which the arrest was effected. Let's assume the arrest was otherwise proper. I'm really following up on Judge Noonan's question, all right? Let's assume for the moment that the arrest was otherwise proper. The fact is that what you have is a, what, 57-year-old man who's having a dispute with a commercial dispute. Is there any reason to think this man is even slightly dangerous? Well, Your Honor, I think when a, you know, I'm sorry, but I just don't understand this line of questioning from the Court. If a man exacts interference with a business operation and he does it in front of customers who fear for their safety and they communicate that to the officer. Dr. Watson had no knowledge anybody feared for their safety, right? Well, sure he did. And he saw himself what was going on when he got there. And the man not only comes up behind him and won't step back when he's asked several times, but now he asked him three times to leave and he won't leave. And he makes a statement in the record. I won't leave until I get my car wiped. Okay. All right. So the next question is if he's going to arrest him. Let's assume he's going to arrest him, right? Right. He takes this guy, slams him against the car, twists his arm behind his back. No evidence in this record that he was slammed against the car. Oh, no, no. The pre-trial conference order which supersedes the pleadings merely says one thing, and that's this, that he refused to loosen the handcuff. That's all it says. Excuse me. Deputy Watson did testify that he pushed him against the car. I read it with my own eyes. He pushes him up against the car to handcuff him. There's no evidence that he slammed against the car hood or thrown down or anything of that nature. I mean, no evidence. In fact, an independent witness says, I watched the arrest. I didn't even see him touch the car. That was the jury's solid evidence. Deputy Watson agrees that he did touch the car. Okay. And I have no problem with that. If you push somebody up against the car to arrest him while he's struggling with you and resisting arrest? And again, with regard to a summary judgment motion, Dr. Wall also testified that he was essentially thrown into the car and hit first and all that. You can disbelieve all of it. The jury can decide it's all totally wrong. But how can we decide? What I need you to explain to me is how we disregard that evidence now. I think I just said it. Number one, it's not in the pretrial conference order, so it doesn't become an issue anymore. I don't know why courts don't follow the procedural rules anymore. It's not an issue if it's not in the pretrial conference order. That alleged excessive force never made it to the pretrial conference order. And there's law, which I've cited in my brief, that says it's gone. Too bad. It's gone. And I think there's a reason it wasn't put in the order, because he knows he wasn't thrown down on the hood the way he claims and defecated in his pants the way he claims. That only came up later in his declaration, which the district court found to be a sham, because it came in later and never during deposition testimony. It reversed his deposition testimony. So it's a nonissue. That's why I say that it shouldn't be considered, and I indicated that in my brief. And it's confusing to me as a lawyer to get in the district court and have a wonderful set of rules that you follow and you're supposed to follow, and it says that if it's not in the order, pal, it's not coming in a trial. And then you get to the court of appeals, and they say, well, wait a minute. We read it in the deposition. Don't you think if that was something that was that important, it would have made it to the pretrial conference order? I mean, I think so. Just common sense. But it didn't. And we simply have a man who came and got excited and upset, and maybe he didn't threaten people with physical injury, but he sure caused a lot of people to be scared. And after that, he did the same thing when the officer got there. The officer asked him three times he wouldn't leave. I think the officer was justified in putting handcuffs on. And I respectfully disagree with the Court that it was a violent attack on Mr. Wall. I don't know how many times is right. How many times do you have to ask somebody to leave before they do? The question you keep dodging is why didn't he simply say you're under arrest? I don't know that. But I submit to the Court that he wasn't required to do that. Why was he required to do that, Your Honor? And I mean that respectfully. I don't understand why. If you want to debate with the Court, you should find some other forum. Well, perhaps I can get some enlightened courts so much better at this than I am. No, we'll try to enlighten you. Thank you very much. Thank you, Your Honors. I know I only have a few minutes, and I want to use them. What is the answer with regard to the breadth of the excessive force? I was not aware that there was a dispute about the which issues are before us on excessive force. Your Honor, the issue of excessive force is in the pretrial conference. What he's saying, see, what's the word when you're not being disingenuous? I'm afraid, Mr. Bernard, I'm not getting that. Let's not have any accusations. What I want to know just very specifically is what is on the pretrial order? There's two issues in this case. Was there an improper arrest? I understand that. But has the excessive force issue been limited by virtue of the pretrial order? No, Your Honor. There was no limitation on the issue of excessive force in this case, period. What counsel is saying is that we didn't raise the issue that he was we didn't put in the pretrial conference order that he was slammed against the car. That's not true. It's true we didn't put it in. That's all part of the scope, the overall breadth of whether or not under to answer Mr. Bernard's question, why do we have to say you're under arrest, because Graham says thou shalt only use that amount of force as reasonably necessary to effectuate. And you look at the severity of the crime, trespass, and you look at whether or not there's any danger to any individuals. There isn't. And you look at whether or not there's anybody fleeing. There wasn't. In fact, according to Deputy Watson, the whole issue was that my client wasn't fleeing. So that's why you have to look, in answer to Mr. Bernard's question. But what I wanted to do to do. Kagan. Pretrial conference statement in the excerpts. I don't believe there was an executed pretrial conference order because the summary judgment motion predated the pretrial conference hearing. What happened in this case is we were supposed to have a pretrial conference. They got an ex parte application for an order shortening time for service of a summary judgment under CELSIA. Okay. They got that granted. We have the summary judgment. So the issue of whether or not excessive force was within the scope of the issues in this case, clearly it was within the scope. For example, if it hadn't been, they would have raised that on the summary judgment motion. No. But my understanding of what's being said is that there was an excessive force issue, but it was a limited one. It was limited to the handcuffs and not to anything else. I'm sure Mr. Bernard would like to argue that. I'm arguing that excessive force. And I'd like to know. Excessive force means excessive force. It's not that it's not an elimination of anything. It's excessive force. Let me ask you a question with reference to that. Do you feel if there's this finding of excessive force as far as the handcuffing is concerned, does that eliminate the qualified immunity defense? I think that the way all the courts, including the Supreme Court, looks at CELSIA is to say if there was a constitutional deprivation, you first decide was there constitutional deprivation. Second, was the act that constituted the constitutional deprivation something that was well known at the time? If you get past those two questions, then you get to argue whether or not the force used in this set of circumstances rose to the level of excessive. Remember, CELSIA was a case in which there was no question about the validity of the arrest, and what the officer did was engage in a shove. Well, engaging in a shove is a far cry from what the facts as alleged by my client and, by the way, to answer the Court, if I may, it's under in Volume I of the appellate's record, the clerk's record, Volume I, commencing at page, well, Dr. Wall's entire declaration commences at page 165, but the specific question that I'm going to ask you, the questions that Your Honor was asking about, that language is contained at pages 168 through 170. And he said, I was walking towards my car. I was attacked from behind. I didn't stop. He said the handcuffs were put on too tight, and I asked him to please loosen the handcuffs. Can I ask one more question? Yes, Your Honor. With reference to the qualified immunity, that's why we're here, isn't it? Because the motion for summary judgment actually granted qualified immunity. Isn't that why we're here? Yes, Your Honor. But the cases consistently hold that where there's a dispute and a reasonable jury could conclude, then you've got to let that jury conclude. But the jury has to determine then whether or not there's qualified immunity? No, the jury determines whether or not, well, yeah, actually, whether a reasonable law, whether or not what the officer did was reasonable under the circumstances. That becomes the question for the jury. If they had to, assuming the worst, if they had to effectuate an arrest for a trespass, is what he did under these circumstances with this doctor that afternoon in Laguna Niguel, was that excessive or not? As I understand, Justice Kennedy, in the Supreme Court decision, says that qualified immunity is not a defense. It's immunity from prosecution. That's correct. And as a result of that, that has to be an early determination by the court so that we don't proceed with the, don't put the officer to the best of going through a trial. He's immune from prosecution. That was the theory. However, this case didn't get to that qualified immunity question until the moments before we were supposed to get a trial date. Well, but there was the motion for summary judgment granted qualified immunity, exactly what the court should do before it goes to trial. But only if, in the, in viewing all the evidence in the light most favorable to the plaintiff, it can be said that a reasonable officer would have done the same thing in the same circumstances. I understand what you're saying. I'm not saying that our qualified immunity law is clear. It's far from, I think it's in sort of a mess right now as far as I'm concerned. But I think it does say that qualified immunity is not a defense. It's immunity from prosecution or from action. Your Honors. And it has to be determined early. And that's exactly what happened here. The judge determined on a motion for summary judgment that there was qualified immunity. That's true. However, the cases are replete. They come down in June. They've come down as recently as January 23rd of this year, in this, of 04, where the courts have said, where you have a question of fact and there's a controversy, you don't grant qualified immunity. You don't grant it unless on the plaintiff's version there would be qualified immunity, which is a separate question from the controversy. Yes. All right. Thank you very much.  And thanks both of you. Okay. Thank you very much. Should we take a break? It doesn't make any difference to me. All right. The case of Wall v. Calgary-Barnes is submitted. And the next case is Sissoko v. Rocha. All right.
judges: Skopil, Noonan, Berzon